**Eli PRITZKER; Sol Cooperstein; Jack Levin, as trustees of Penn Electric Supply Company Profit Sharing Plan; Penn Electric Supply Company; Coatesville Electric Supply Company; Northeast Electric Supply Company; M & G Electric Supply Company; Doylestown Electric Supply Company, Appellees,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; Merrill Lynch Asset Management, Inc.; Belinda P. Stewart, Appellants.**

No. 93–1215.

United States Court of Appeals, Third Circuit.

Argued June 8, 1993.

Decided Oct. 15, 1993.

David C. Franceski, Jr. (argued), Stradley, Ronon, Stevens & Young, Philadelphia, PA, for appellants.

David L. Braverman (argued), Fellheimer, Eichen & Braverman, Philadelphia, PA, for appellees.

Before GREENBERG, NYGAARD and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

In this appeal, we revisit an issue which has commanded the attention of the Supreme Court and other courts of appeals since we last addressed it: whether claims of statutory violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), are subject to arbitration pursuant to section 2 of the Federal Arbitration Act ("FAA" or "Arbitration Act"), 9 U.S.C. § 2. In *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923 (3d Cir.1985), we held that statutory ERISA claims are not subject to arbitration. Since *Barrowclough*, however, Supreme Court de-

cisions have substantially revised the rationale we relied upon there. We now hold that such claims are subject to arbitration under the FAA. We will, therefore, overrule *Barrowclough* insofar as it held that arbitration of statutory ERISA claims is precluded, and reverse the district court's order denying defendant's motion to compel arbitration of the plaintiffs' claims in this case. We also hold that the arbitration clauses in the agreements in question here should be read to include all of the named defendants even though only one defendant signed them. Accordingly, we will instruct the district court to order arbitration of the claims against the non-signatory defendants as well.[1]

### I.

### A.

The plaintiffs in this case are Eli Pritzker, Sol Cooperstein and Jack Levin (collectively the "Trustees"), as trustees of the Penn Electric Supply Company Profit Sharing Plan, a pension plan formed on behalf of the Trustees' co-plaintiffs Penn Electric Supply Company, Northeast Electric Supply Company, Coatesville Electric Supply Company, M & G Electric Supply Company and Doylestown Electric Supply Company. (For ease of reference, we will refer to all plaintiffs as the Trustees.)

The defendants include the brokerage firm, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF & S"), Belinda P. Stewart ("Stewart") and Merrill Lynch Asset Management, Inc. ("MLAM") (collectively "Merrill Lynch"). Stewart is a financial consultant who was employed by MLPF & S during the period relevant to this case. MLAM, like MLPF & S, is a wholly-owned subsidiary of Merrill Lynch & Co., Inc. It provides advisory services to pension plans and funds.

In December 1987, the Trustees opened Cash Management Accounts for Retirement Plans with MLPF & S (the "Accounts"). The Accounts were opened on behalf of five profit sharing trusts in which the assets of the plaintiff-companies' pension plan are held. For each trust, the Trustees executed a Merrill Lynch Cash Management Account for Retirement Plans Agreement (a "Cash Management Agreement"). Each Cash Management Agreement contained a clause specifying arbitration as the forum for resolving all controversies between the Trustees and MLPF & S. The Cash Management Agreements also stated that MLPF & S would neither exercise discretionary control or authority over the Trustees' investments nor offer investment advice to the Trustees on a regular basis. Neither Stewart nor a representative from MLAM signed any of the Cash Management Agreements.

As a financial consultant to the Accounts, Stewart also made investment purchases for them. Accepting as true the Trustees' allegations, the dispute in this case flows directly from Stewart's unauthorized purchase of several units of a limited partnership interest in ML Lee Acquisition Fund II, L.P. ("ML Lee"), which she deemed an appropriate investment for the Accounts, in October and November, 1989.

The Trustees alleged that the ML Lee purchases were inappropriate for the Accounts because the units were illiquid, lacked a secondary market and involved a high degree of risk. They also claimed that Stewart's purchases were contrary to the pension plan's stated investment objectives of avoid-

---

1. We hold only that statutory ERISA claims are subject to arbitration under the FAA when the parties have executed a valid arbitration agreement encompassing the claims at issue. For a number of reasons (and the following list is not intended to be exhaustive), this opinion should not be read to require arbitration of statutory ERISA claims in all instances. First, our focus here is limited to arbitration under the FAA. We do not address, for example, labor or any other type of arbitration which may arise from the collective bargaining process or otherwise implicate the concerns we have previously expressed about a potential for conflict of interest. *See Barrowclough*, 752 F.2d at 940; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, ———, 111 S.Ct. 1647, 1650, 114 L.Ed.2d 26 (1991). Second, in contrast to this case, certain types of statutory ERISA claims may arise in such a fashion or may so implicate employees' rights that they come within the provision of the FAA which precludes arbitration of contracts of employment. *See* 9 U.S.C. § 1. Finally, as explained further *infra*, the arbitration agreement must be valid and must encompass the ERISA claims at issue for the claims to be subject to arbitration rather than the judicial process.

ing high-risk securities with capital gains potential in favor of low-risk, liquid, conservative investments with consistent returns, and were adverse to the interests of the trusts.

### B.

On November 6, 1992, the Trustees filed an amended complaint against Merrill Lynch in the United States District Court for the Eastern District of Pennsylvania. In Count I, the Trustees alleged that the defendants breached their fiduciary duties under ERISA by purchasing ML Lee fund units on behalf of the retirement plan without authorization. In Count II, they alleged that MLAM, as custodian of the Accounts, was liable for its "knowing participation" in the alleged breaches of statutory duties because it credited purchase transactions to the Accounts. In Count III, they alleged that the ML Lee purchases violated section 406 of ERISA, 29 U.S.C. § 1106, because Stewart received a six percent sales commission on the transactions and either MLPF & F or MLAM sponsored the fund.[2]

Merrill Lynch moved to compel arbitration of the Trustees' claims pursuant to the FAA and the arbitration clause contained in the Cash Management Agreements. The district court denied that motion, stating that *stare decisis* compelled it to follow *Barrowclough.* Believing *Barrowclough* to be outmoded in light of recent Supreme Court cases addressing the arbitrability of statutory claims under the FAA, Merrill Lynch has appealed.

### II.

The district court had subject matter jurisdiction over this case pursuant to 29 U.S.C. § 1132(e)(1). We have appellate jurisdiction under 9 U.S.C. § 16(a)(1)(C), which permits appeal as of right from orders denying motions to compel arbitration.

This appeal requires us to decide the legal question whether the Trustees may be compelled to arbitrate their claims pursuant to their agreement with MLPF & S. Our standard of review is plenary. *Hays and Co. v. Merrill Lynch,* 885 F.2d 1149, 1152 (3d Cir. 1989).

### III.

In addressing the parties' contentions, we must answer three rather straightforward questions. First, we must decide whether the Trustees agreed to arbitrate the claims they now raise; if they did, we must then decide whether their statutory ERISA claims are subject to arbitration despite our holding in *Barrowclough.* Finally, we must decide whether the Trustees' claims against Stewart and MLAM are subject to arbitration even though neither Stewart nor MLAM signed the arbitration agreements.

### A.

Section 2 of the FAA provides:

A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, … shall be valid, irrevocable, and unenforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA was enacted to "revers[e] centuries of judicial hostility to arbitration agreements" by " 'plac[ing] arbitration agreements "upon the same footing as other contracts." ' " *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225–26, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987), *quoting Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510–511, 94 S.Ct. 2449, 2453, 41

---

**2.** Section 406(b) provides:

A fiduciary with respect to a plan shall not:
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interest of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such a plan in connection with a transaction involving the assets of the plan.

L.Ed.2d 270 (1974).[3] Clearly, the Cash Management Agreements are contracts involving commerce and therefore come within the Act.[4]

Section 3 of the FAA provides that federal courts hearing cases concerning issues which the parties have agreed to arbitrate shall, upon application of one of the litigants, stay a trial until arbitration has been completed in accordance with the terms of the agreement. 9 U.S.C. § 3. If a party refuses to participate in arbitration, the FAA requires a district court to order the parties "to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

 The arbitration clauses in the Cash Management Agreements state:

> It is understood that the following agreement to arbitrate does not constitute a waiver by the undersigned of the right to seek a judicial forum where such a waiver would be void under the Federal Securities Laws or the Employment Retirement Income Securities Act of 1974.
>
> The undersigned agrees, and by carrying an account for the undersigned you agree, that except as inconsistent with the foregoing sentence, all controversies which may arise between us, including but not limited to, any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration and shall be governed by the laws of the state of New York.
>
> Any dispute hereunder shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Directors of the New York Stock Exchange, Inc., or pursuant to the Code of Arbitration Procedure of the National As-

sociation of Securities Dealers, Inc. as the undersigned may elect ...

"[A]s a matter of contract, no party can be forced to arbitrate unless that party has entered an agreement to do so." *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990). Thus, before it compels arbitration, a court should determine "that a valid agreement to arbitrate exists between the parties and that the specific dispute [comes] within the substantive scope of the agreement." *Id.* "Federal law applies when construing an arbitration clause when, as here, the motions pertaining to arbitration are brought pursuant to the [FAA]." *Barrowclough,* 752 F.2d at 937.

The Trustees cite two reasons in support of their contention that they did not agree to submit their claims to an arbitrator. First, they claim that the mismanagement alleged in the amended complaint came about because the defendants acted outside the scope of their authority under the agreement. In essence, the Trustees argue that they only agreed to arbitrate claims based on activities which were within the scope of the defendants' duties under the agreement and that because the defendants breached the terms of the agreement by acting outside the scope of their authority, the claims brought before the district court may not be remitted to arbitration.

The arbitration clauses at issue, however, govern "all controversies which may arise between [the Trustees and MLPF & S]." Courts have broadly construed similar agreements, interpreting them to apply to all disputes between signatories. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the

---

29 U.S.C. § 1106(b).

3. *Despite the trustees' arguments to the contrary, the FAA was not enacted to promote the expeditious resolution of claims. Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219–20, 105 S.Ct. 1238, 1241–42, 84 L.Ed.2d 158 (1985) (rejecting that suggestion, although noting that Congress recognized that the FAA would be beneficial because expeditious resolution of claims would be a byproduct of its passage). The trustees' argu-

ment that mandating arbitration in this case would not further the purposes of the FAA because this litigation has already been time-consuming and expensive is, therefore, unavailing.

4. The parties do not dispute that the arbitration clauses at issue were executed during the course of "a transaction involving commerce," within the meaning of the FAA. *See, e.g., Hays,* 885 F.2d at 1152–53.

scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); *see also Hays*, 885 F.2d at 1153–54 (bankruptcy trustee "stands in the shoes of the debtor" for purposes of arbitration clause and must arbitrate all claims that are derived from the rights of the debtor). In our view, the Trustees' contention that they are free to litigate their claims in federal court because the defendants allegedly acted outside the scope of their authority under the agreement flatly contradicts the inclusive language contained in the clauses in question. This language does not distinguish between disputes based on conduct within or outside the scope of authority granted in the Cash Management Agreements; indeed, one is left to ponder what purpose an arbitration clause would serve if it did not encompass claims that the terms of the parties' agreement had been breached.

■■■ Nor are we persuaded by the Trustees' argument that their interpretation of the first two paragraphs of the arbitration clause shows that they did not intend to subject statutory ERISA claims to arbitration. It is true that the first paragraph provides that the arbitration agreement will not constitute a waiver of the right to seek a judicial forum where such a waiver is void under the federal securities laws or ERISA. The second paragraph provides that "except as inconsistent with" the first paragraph, all disputes between the Trustees and MLPF & S are to be submitted to arbitration. Inasmuch as *Barrowclough*, which clearly precluded arbitration of statutory ERISA claims, was the law in this circuit at the time the Trustees signed their agreements, the Trustees contend that they could not have intended to submit statutory ERISA claims to arbitration. Despite the apparent logic of this "frozen in time" argument, however, the Trustees may not pursue it here because they did not raise it before the district court.

*Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We will review claims not raised in the district court only when manifest injustice would result from a failure to consider novel issues, *Houghton v. American Guar. Life Ins. Co.*, 692 F.2d 289, 294 (3d Cir.1982), and we do not view this case as one which merits inclusion in that extraordinary category. It can hardly be said that a manifest injustice would result from our rejection of the Trustees' interpretation of the two clauses, since they are assured of a forum in any event.

In sum, the arbitration clauses at issue contemplate the types of claims the Trustees have asserted in this litigation.

**B.**

Having determined that the Trustees agreed to arbitrate their ERISA claims, we now consider whether they may be arbitrated in light of *Barrowclough* and in the wake of intervening Supreme Court decisions. We commend the district court judge for faithfully adhering to this circuit's precedent in applying *Barrowclough* despite his understandable inclination to compel arbitration given the current strong federal policy favoring this method of resolution. We are likewise mindful that the doctrine of *stare decisis* counsels reluctance when we are confronted with a situation calling for the internment of a precedent; however, we have not hesitated to act when we discover that our decisions have fallen out of step with current Supreme Court jurisprudence. *See Stana v. School District of City of Pittsburgh*, 775 F.2d 122, 129–30 & n. 8 (3d Cir.1985); *Rubin v. Buckman*, 727 F.2d 71, 73–74 (3d Cir.1984) (Garth, J., concurring) (explaining that our Internal Operating Procedure 8(c) [now 9.1] does not preclude overruling another panel's holding in light of intervening Supreme Court precedent). Our decision in *Barrowclough* has joined that species insofar as it concerns the issue before us.[5] Thus, to conform our deci-

---

5. We hasten to note that we overrule *Barrowclough* only with regard to its holding that statutory claims are not subject to arbitration, and the reasoning we employed in reaching that conclu-

sion. *Barrowclough* remains the law of this circuit in other respects; indeed, we continue to cite portions of the opinion as authoritative in connection with our disposition of some of the

sions to the clear trend in recent Supreme Court cases, and for the reasons more fully-developed below, we now conclude that agreements to arbitrate statutory ERISA claims under the FAA may be upheld. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (enforcing agreement to arbitrate claims arising under the Securities Act of 1933 and stating that prior decisions holding such clauses unenforceable had "fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes"); *see also Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (claims under antifraud provisions of 1934 Securities Exchange Act and treble-damage claims under Racketeer Influenced and Corrupt Organizations Act held arbitrable); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (nothing in Arbitration Act implies a presumption against arbitration of statutory claims); *see also Olde Discount Corp. v. Tupman*, 1 F.3d 202, 208 (3d Cir.1993) (Greenberg, J., separate opinion); *Hays*, 885 F.2d 1149, 1153–57 (district court lacks discretion to deny enforcement of arbitration clause in non-core proceeding brought by bankruptcy trustee); *Bird v. Shearson Lehman/American Express, Inc.*, 926 F.2d 116 (2d Cir.1991) (enforcing agreement to arbitrate statutory ERISA claims); *see also Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.*, 847 F.2d 475 (8th Cir.1988).

### C.

In *Barrowclough*, a discharged stockbroker sued his former employer for improperly withholding deferred compensation benefits and for violating ERISA's reporting and fiduciary provisions. We held that while claims to establish or enforce rights to benefits under 29 U.S.C. § 1132(a) are subject to arbitration, claims based on violations of the substantive provisions of ERISA can be asserted in a federal court in spite of an arbitration agreement. *Barrowclough*, 752 F.2d at 939. Our reasoning evolved from two issues presented in this appeal. *See page 1112,*

cases in which the Supreme Court decided that statutory claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, could be pursued in court after the employees asserting them had already proceeded through the labor arbitration process pursuant to their collective bargaining agreements. *See Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

At that time, we examined the text, structure and purpose of ERISA and concluded that statutory ERISA claims, over which federal courts have exclusive jurisdiction pursuant to 29 U.S.C. § 1132(e), must be brought in court rather than pursued in arbitration for three reasons. First, ERISA constituted a "complex and evolving body of federal law" requiring judicial interpretation to implement Congress' purpose of enforcing "minimum standards" to protect employee benefits. *Barrowclough*, 752 F.2d at 940. Second, we found that the provisions of ERISA which afforded complainants broad access to the courts, as well as the absence of procedural barriers to ERISA lawsuits, suggested that Congress had intended that courts, not arbitrators, handle statutory claims. *Id.* Finally, we expressed concern that arbitrators might not be sufficiently trained to handle the complex legal issues presented by ERISA claims. *Id.*

Merrill Lynch essentially argues that the precedential status of *Barrowclough* is relegated to obsolescence by subsequent Supreme Court decisions addressing the arbitrability of statutory claims under the FAA. In particular, Merrill Lynch directs our attention to *McMahon* and *Rodriguez*, in which the Court enforced agreements to arbitrate trading loss claims similar to those asserted by the Trustees in this case. A review of these cases is necessary to understand their impact on *Barrowclough*.

In *McMahon*, plaintiffs, individually and as trustees for various pension and profit-sharing plans, sued a brokerage firm and the footnote 1, *supra,* and *pages* 1115, 1122, *infra.*

financial consultant who handled their accounts. *McMahon*, 482 U.S. at 222, 107 S.Ct. at 2335. The complaint alleged that the consultant, with the brokerage firm's knowledge, had violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 CFR § 240.10b–5 (1986), by engaging in fraudulent and excessive trading on the plaintiffs' accounts and by making false statements and omitting material facts when giving them advice. *Id.* The complaint also alleged a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state law claims of fraud and breach of fiduciary duties. *Id.*

The United States Court of Appeals for the Second Circuit affirmed that part of the district court's order denying the motion to compel arbitration of plaintiffs' RICO claim, concluding that "public policy" concerns made it inappropriate to apply provisions of the FAA to RICO claims. It then followed circuit precedent and held that the claims arising under the Exchange Act and Rule 10(b)–5 were not subject to compulsory arbitration under the Supreme Court's decision in *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

The Supreme Court reversed both holdings. Because the FAA established a federal policy favoring arbitration, *McMahon*, 482 U.S. at 226, 107 S.Ct. at 2337, the Court stated that federal courts must enforce arbitration agreements in a variety of contexts:

> Th[e] duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded upon statutory rights. As we observed in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, [473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)], "we are well past the time when judicial suspicion of the desirability of arbitration and the competence of arbitral tribunals" should inhibit enforcement of the Act "in controversies based on statutes."

*Id.*

After reviewing several other provisions of the FAA, the Court concluded that the statute required enforcement of arbitration clauses unless either: (1) there existed "a well-founded claim that the arbitration [clause] resulted from the sort of fraud or excessive economic power" which could invalidate any contract; or (2) the party opposing arbitration demonstrated that Congress intended to prohibit waiver of judicial remedies for the statutory rights in question. *Id.*, 482 U.S. at 226–29, 107 S.Ct. at 2337–39. The Court elaborated on the evidentiary sources of the second basis for avoiding arbitration, stating that "if Congress intend[ed] to limit or prohibit waiver of a judicial forum for a particular claim, such an intent [may be ascertained] from the statute's text, legislative history ... or from an inherent conflict between arbitration and the statute's underlying purpose." *Id.* at 227, 107 S.Ct. at 2337–38 (citations and internal quotations omitted).

The Court in *McMahon* emphasized that it was rejecting most of the reasons offered in prior decisions as a basis for refusing to enforce arbitration clauses. For example, the Court stated that it no longer recognized any justification for presuming that arbitral tribunals were incapable of handling complex disputes. *Id.*, 482 U.S. at 232, 107 S.Ct. at 2340. Similarly, the Court concluded that streamlined arbitration procedures did not necessarily entail any diminution of substantive rights. *Id.* Finally, the Court indicated that there was no reason to believe that arbitrators would not follow the law since judicial review was sufficient to ensure that arbitrators complied with the commands of federal statutes. *Id.*

Two years after *McMahon*, the Court reaffirmed the enforceability of agreements to arbitrate statutory claims in *Rodriguez.* Plaintiffs had sued a brokerage firm and its agent for alleged violations of federal and state law, including claims under three sections of the Exchange Act and one under section 12(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(2). In concluding that all of their claims were subject to compulsory arbitration, the Court overruled *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, in which it had ruled that agreements to arbitrate claims arising under the Securities Act were not enforceable.

The *Rodriguez* Court sharply criticized the decision in *Wilko* and characterized it as "pervaded by outmoded presumptions disfavoring arbitration." *Rodriguez*, 490 U.S. at 481, 109 S.Ct. at 1920. Noting the steady erosion of support for the view that arbitration somehow weakened the protections afforded in substantive laws, the Court rejected any suggestion that a party necessarily traded away statutory rights by agreeing to arbitrate a statutory claim. *Id.*

*McMahon*'s analysis makes it clear that agreements to arbitrate statutory ERISA claims under the FAA may be enforceable. *See generally* Shell, *ERISA and Other Federal Employment Statutes: When Is Commercial Arbitration an "Adequate Substitute" for the Courts?*, 68 Tex.L.Rev. 509 (1990) (hereinafter "Shell"). When we apply *McMahon*'s reasoning to the facts before us, we have no doubt that the agreement to arbitrate must be upheld.

### 1.

■ First (and not implicating *Barrowclough*, of course), under *McMahon*, if there is a "well-founded" claim that the agreements resulted from fraud or coercion, a party may not be compelled to arbitrate its claims. *See also* 9 U.S.C. § 2 (arbitration agreements are enforceable "save upon such grounds as exist at law or equity for the revocation of any contract"). The Trustees do not seriously attack the validity of the Cash Management Agreements or their respective arbitration clauses here. Although they repeatedly refer to the agreements they signed as "required clause[s] in a preprinted contract," we reject any insinuation that the clauses represent contracts of adhesion or "resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *See Mitsubishi Motors Corp.*, 473 U.S. at 627, 105 S.Ct. at 3354. To the contrary, the record reveals no

more than that the arbitration clauses were indeed part of pre-printed investment agreements and that the parties may have possessed unequal bargaining power when the agreements were signed. The Supreme Court has ruled, however, that agreements between securities dealers and investors are enforceable even though they may involve unequal bargaining power. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, ——, 111 S.Ct. 1647, 1655, 114 L.Ed.2d 26 (1991) (citing *Rodriguez*, 490 U.S. at 484, 109 S.Ct. at 1921); *McMahon*, 482 U.S. at 230, 107 S.Ct. at 2339; *see also Gilmer*, 500 U.S. at ——, 111 S.Ct. at 1661 (Stevens, J., dissenting) ("[a]lthough I remain persuaded that it erred in doing so, the Court has ... put to one side any concern about the inequality of bargaining power between an entire industry, on the one hand, and an individual customer, or employee, on the other.").

### 2.

Similarly, under *McMahon*, the Trustees might avoid arbitration if they could demonstrate that Congress intended to prevent a waiver of judicial remedies for statutory ERISA violations. They are unable to do so, however, because they have not identified a specific provision in ERISA's text which indicates that Congress intended to exempt statutory ERISA claims from the FAA.

As we have noted, in *Barrowclough*, we construed provisions in ERISA's statutory scheme which conferred exclusive jurisdiction on the federal courts to mean that the legislature intended to preclude arbitration of statutory ERISA claims. *Barrowclough*, 752 F.2d at 940. In *McMahon* and *Rodriguez*, however, the Supreme Court twice rejected a similar inference drawn from the jurisdictional provisions of the federal securities laws.[6] Instead, relying on *Mitsubishi Motors*, which held that claims under the federal antitrust laws were arbitrable despite provisions vest-

---

6. In *McMahon*, the plaintiffs argued that exclusive federal jurisdiction over claims under the Exchange Act permitted the inference that Congress intended to preclude arbitration of Exchange Act claims. In *Rodriguez*, plaintiffs attempted to draw a similar inference from the non-exclusive, concurrent jurisdictional authority granted federal courts under the Securities Act.

The Court declined to draw the inference in either case, implying in *Rodriguez* that the distinction between exclusive and non-exclusive jurisdictional provisions was largely irrelevant for purposes of determining the arbitrability of statutory claims. *Rodriguez*, 490 U.S. at 482, 109 S.Ct. at 1920.

ing exclusive jurisdiction in the federal courts, the *McMahon* Court held that claimants may waive the right to pursue securities claims exclusively in federal court by executing a valid compulsory arbitration agreement. *McMahon*, 482 U.S. at 227–29, 107 S.Ct. at 2337–39. As the Court has repeatedly stated, such jurisdictional provisions speak only to the issue of which judicial forum is available, and not to whether an arbitral forum is unavailable. *Rodriguez*, 490 U.S. at 482–83, 109 S.Ct. at 1920–21; *McMahon*, 482 U.S. at 227–28, 107 S.Ct. at 2337–38; *Mitsubishi Motors*, 473 U.S. at 628, 105 S.Ct. at 3354. In other words, such provisions do not constitute Congressional statements that statutory ERISA claims cannot be arbitrated.

*Barrowclough's* reasoning that the absence of procedural barriers to initiating suit in federal court signals a Congressional intent to preclude waiver of a judicial forum has also been rejected by the Supreme Court. *See Barrowclough*, 752 F.2d at 940. In *Rodriguez*, the Court concluded that the broad venue provisions of the Securities Act permitting nationwide service of process and the elimination of the amount-in-controversy requirement formerly applicable to fraud claims between diverse litigants did not demonstrate a Congressional intent to preclude arbitration of claims under the Securities Act. In light of this holding, similar venue and service of process provisions in ERISA's statutory framework, *see* 29 U.S.C. § 1132(e)(1), (2), can hardly be understood to mean that Congress intended to bar arbitration of statutory ERISA claims.

We also find little support for the proposition that ERISA's legislative history reflects a Congressional desire to exempt statutory ERISA claims from the reach of federal arbitration laws. In reaching the opposite conclusion in *Barrowclough*, we took comfort in statements indicating that ERISA was intended to provide a consistent source of law to "help administrators, fiduciaries and participants to predict the legality of proposed actions." *Barrowclough*, 752 F.2d at 941 (quoting S.Rep. No. 127, 93d Cong., 2nd Sess. 29, *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4865). Since *Barrow-*

*clough*, however, the Supreme Court has largely rejected the notion that general statements of legislative purpose indicate that Congress intended to prohibit enforcement of arbitration agreements. "So long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer*, 500 U.S. at ——, 111 S.Ct. at 1653 (citations omitted).

3.

We, of course, do not lightly overturn circuit precedent. If it were possible to distinguish *Barrowclough* from this case, we would do so rather than enunciate a new rule. One possible ground for distinguishing between this case and *Barrowclough* is the fact that *Barrowclough* involved claims which arose in an employment context, about which a court may be more concerned because "contracts of employment" are explicitly exempted from the FAA. The Trustees, in fact, argue that *Barrowclough* "remains persuasive" because of its desire to provide "special protection for workers." Trustees' brief at 14. It would be disingenuous to attempt to distinguish *Barrowclough* on that basis, however. Our decision in *Barrowclough* in no way hinged upon the facts that were before us at that time. *See supra* pages 1116–17. It therefore cannot be distinguished; nor do additional arguments asserted by the Trustees justify its remaining the law of this circuit.

First, we recognize that the *Barrowclough* panel was persuaded at least in part by concerns for the development of ERISA law, but these concerns have since been deemed insufficient to preclude arbitration. *See Gilmer*, 500 U.S. at ——, 111 S.Ct. at 1655. As the Court noted in *Gilmer* in the age discrimination context, there is no reason to suspect that all ERISA claims will be subject to arbitration; judges will continue to issue decisions interpreting sections 404 and 406 of ERISA. Therefore, compelling arbitration of the Trustees' statutory ERISA claims will not stifle judicial development of the law.

Second, the Trustees defend *Barrowclough* based upon a parallel between contracts of employment and pension plan agreements.

They correctly note that the FAA by its own terms does not apply to employment contracts. *See* 9 U.S.C. § 1 ("nothing contained herein shall apply to contracts of employment of … any … class of workers engaged in interstate or foreign commerce[ ]"). Next, however, they argue that because ERISA was intended to protect the rights of workers who participate in pension and other employee welfare benefit plans, the asset management contracts in this case are akin to contracts of employment.

We must reject this analogy between asset management agreements and run-of-the-mill employment contracts. The arbitration clauses in this case were not contained within employment contracts; they were contained within asset management agreements between the Trustees and the brokerage firm which agreed to manage plan funds. The Cash Management Agreements did not implicate workplace conditions, terms of employment or other topics ordinarily covered by employment contracts. Moreover, there was no management-labor relationship between the defendants and the plan beneficiaries; instead, their relationship, which had its inception when the plan sought investments, was a common one between a brokerage firm and its clients. *See Gilmer*, 500 U.S. at ——, n. 2, 111 S.Ct. at 1651, n. 2 (arbitration clause in securities registration application was not contained in employment contract). *See also McMahon*, 482 U.S. at 238, 107 S.Ct. at 2343. Because the record does not support the assertion that the arbitration clauses in question were contained within employment agreements, the Trustees cannot avoid compulsory arbitration based on the exception contained in section 1 of the FAA.

Third, the Trustees attempt to salvage *Barrowclough* by distinguishing both it and the present case from *Gilmer*. The Trustees argue that in *Gilmer* an individual claimant "contracted away his right to sue in federal court by his own hand." Trustees' brief at 30. By contrast, the Trustees maintain that both *Barrowclough* and the case before us involve situations in which the right to proceed in federal court was waived by someone other than an individual worker who had the right to vindicate his or her rights through judicial proceedings.

In *Barrowclough*, we did recognize certain special concerns that arise when collective bargaining agreements contain provisions compelling arbitration of statutory protections directed at providing substantive guarantees to individual workers. *See Barrowclough*, 752 F.2d at 940. As noted previously, we cited and relied heavily upon *Barrentine*, 450 U.S. 728, 101 S.Ct. 1437, and *Alexander*, 415 U.S. 36, 94 S.Ct. 1011, two Supreme Court cases permitting claimants to pursue statutory claims in federal court despite the completion of arbitral proceedings in accordance with collective bargaining agreements. The Trustees argue that *Barrowclough* remains apposite because it relied upon *Alexander* and *Barrentine*, which the Court has left intact despite intervening decisions.

While it is true that the Court has not overruled *Alexander* and *Barrentine* since deciding *McMahon, Rodriguez* and *Gilmer*, it does not follow that *Barrowclough* retains its validity. The Court has delineated "several important distinctions" between *Alexander* and *Barrentine* and cases involving whether a statutory claim may be commercially arbitrated. *See Gilmer*, 500 U.S. at ——, 111 S.Ct. at 1650 (ruling that ADEA claim may be subject to arbitration). "First, those cases did not involve the issue of whether an agreement to arbitrate statutory claims was unenforceable." *Id.* Instead, those cases centered on the issue of whether arbitration of claims pursuant to collective bargaining agreements precluded subsequent judicial resolution of statutory claims.

Second, the Court has indicated that in *Alexander* and *Barrentine*, it was concerned with the fact that those cases arose in the collective bargaining context, where individual claimants were represented by unions and there existed a possible tension between the goals of collective representation and vigilant enforcement of individual statutory rights. *Id.* The Trustees analogize this case to *Alexander* and *Barrentine*, asserting that they, as trustees, represent many plan beneficiaries when they enter into an asset management agreement with a brokerage firm to handle a plan's assets. This analogy fails,

however, because unlike the potential conflict between a union's duty to represent collective interests and its duty to pursue grievances on behalf of an individual, plan trustees entering into asset management agreements with brokerage firms safeguard the unitary interests of individual and group beneficiaries with assets in the plan. Thus, a trustee's duties do not involve an inherent tension which would give rise to the special concerns addressed in *Alexander* and *Barrentine. See also Gilmer,* 500 U.S. at ——, 111 S.Ct. at 1657 (distinguishing *Alexander* and *Barrentine* because "those cases were not decided under the FAA, which ... reflects a 'liberal federal policy favoring arbitration agreements'"); Shell, 68 Tex.L.Rev. at 563 (concerns regarding labor arbitration of statutory ERISA claims remain valid, but a functional analysis of commercial arbitration supports arbitrability in that context).

Finally, in arguing that arbitration is inconsistent with ERISA's statutory purpose, the Trustees contend that since there is no assurance that arbitrators will follow court precedents, compulsory arbitration of ERISA claims frustrates the legislative goal of developing a consistent body of law. This argument has a familiar ring; it is a reiteration of the traditional distrust of arbitration on the ground that arbitrators cannot be relied upon to follow the law. The Court has uniformly rejected this position in its recent arbitration cases, however, and we will only briefly address the Trustees' contentions in this regard.

The Trustees make much of the fact that neither the American nor the New York Stock Exchanges require that arbitrators give reasons for their decisions. The lack of such a requirement, the Trustees speculate, results in a stifling of the law's development, provides poor guidance for plan beneficiaries and fiduciaries and results in an inability to obtain effective appellate review. In *Gilmer,* however, the Court rejected similar claims, observing that the New York Stock Exchange arbitration rules provided for publica-

tion of written award summaries including the names of the parties, a statement of the issues and a description of the award. *Gilmer,* 500 U.S. at ——, 111 S.Ct. at 1655. For present purposes, we see no reason to distinguish between the ADEA claims at issue in *Gilmer* and the ERISA claims before us. Instead, we believe it is consistent with the Court's analysis in *Gilmer* to hold that an award summary need not state a rationale to avoid conflicts with the fundamental purposes of ERISA.[7]

### D.

◼ Although we have determined that the Trustees' agreement to arbitrate alleged statutory ERISA violations under the FAA is enforceable, there remains the question of who, exactly, will be bound by its terms. Only one of the appellants, MLPF & S, was a party to the Cash Management Agreements. The Trustees argue that their claims against MLAM and Stewart should not proceed to arbitration because those defendants were not signatories to the arbitration agreements. For the reasons below, we reject this argument.

◼ As to Stewart, the decision is quite straightforward. Under traditional agency theory, she is subject to contractual provisions to which MLPF & S is bound. *Barrowclough,* 752 F.2d at 938. Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements. *See, Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281–82 (6th Cir.1990); *Letizia v. Prudential Bache Securities,* 802 F.2d 1185, 1187–88 (9th Cir.1986).

In *Arnold,* for example, a shareholder filed suit against a corporation and its officers alleging RICO violations and asserting claims under section 10(b) of the Exchange Act. In holding that the arbitration clause should be enforced, the court also extended its scope to non-signatory officers who were deemed

---

**7.** The Trustees also contend that judicial review of arbitration decisions is "too limited" to ensure that arbitral awards comply with statutory mandates. *McMahon,* however, made clear that "although judicial scrutiny of arbitration awards is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute" in question. *McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340.

agents of the corporation. *Arnold,* 920 F.2d at 1281–82. Similarly, in *Letizia,* the court held that statutory claims against non-signatory brokers were subject to arbitration agreements. *Letizia,* 802 F.2d at 1187–88.

The *Letizia* court noted that brokers and employees were integral to, if not directly responsible for, the alleged statutory violations of the principal corporation. Indeed, "[a]ll of the individual defendants' allegedly wrongful acts related to their handling of Letizia's securities account. . . . We conclude that the arbitration clause is applicable to [claims against the broker and his supervisor]." *Id.* at 1188. *See also Trott v. Paciolla,* 748 F.Supp. 305, 309 (E.D.Pa.1990) ("Mr. Paciolla was an employee of Merrill Lynch. An entity such as Merrill Lynch can only act through its employees, and an arbitration agreement would be of little value if it did not extend to [them]."). In keeping with the federal policy favoring arbitration, we share the views of the Courts of Appeals for the Sixth and Ninth Circuits and will extend the scope of the arbitration clauses to agents of the party who signed the agreements.

 For analogous reasons, we find that the claims against MLAM, the corporate sister of MLPF & S, likewise fall within the scope of the arbitration agreements. Agency logic has been applied to bind non-signatory business entities to arbitration agreements. *Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc.,* 998 F.2d 145 (3d Cir.1993); *Nesslage v. York Securities, Inc.,* 823 F.2d 231, 233 (8th Cir.1987); *see also Ketchum v. Almahurst Bloodstock IV,* 685 F.Supp. 786, 793–94 (D.Kan.1988). While it is not exactly clear what role MLAM played in the alleged statutory violations, it is evident from the record that MLAM was obligated to perform certain services in connection with the Accounts opened by the Trustees. Moreover, MLAM, like MLPF & S, is a subsidiary of Merrill Lynch & Co., Inc., and may be an alter-ego of MLPF & S.

In our recent decision in *Sharp Properties,* for example, we enforced an arbitral award

against a non-signatory who did not participate in arbitration proceedings adjudicating its interests. Relying on *Barrowclough,* we noted that arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory. *Sharp Properties,* 998 F.2d at 155. Our reasoning in *Sharp Properties* compels a similar conclusion in this case. Count II of the amended complaint asserts that MLAM is liable to the Trustees for its "knowing participation in breaches of fiduciary duties owed to the plan." The Trustees' own theory of liability demonstrates that MLAM's interests are directly related to, if not predicated upon, MLPF & S' conduct. We conclude, therefore, that claims against MLAM are subject to compulsory arbitration in accordance with the terms found in the Cash Management Agreements.[8]

## IV.

To recapitulate, we hold that statutory ERISA claims are subject to compulsory arbitration under the FAA and in accordance with the terms of a valid arbitration agreement. Where the parties to such a clause unmistakably intend to arbitrate all controversies which might arise between them, their agreement should be applied to claims against agents or entities related to the signatories. Because the Trustees executed an agreement which stated that all controversies between themselves and MLPF & S would be resolved in an arbitral forum, we will reverse the district court's reluctant refusal to remit the Trustees' claims to arbitration, while applauding its adherence to *stare decisis.* We will remand this case for entry of an order compelling arbitration.

---

8. Because the claims against the non-signatories are subject to compulsory arbitration, we are not presented with a case in which the district court would have discretion to stay judicial proceedings pending the outcome of arbitration. *See Moses H. Cone,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23; *see also Barrowclough,* 752 F.2d at 938.