817 So.2d 952 (2002)
Sami QUBTY, et al., Appellants,
v.
Rasiklal NAGDA, et al., Appellees.
Nos. 5D01-3069, 5D01-3205.
District Court of Appeal of Florida, Fifth District.
May 24, 2002.
*953 Robin T. Pero, of Butler Burnette Pappas LLP, Tampa, for Appellant, New England Life Insurance Company.
*954 Lloyd R. Schwed and Douglas A. Kahle, of Kubicki, Draper, P.A., West Palm Beach, for Appellant, Sami Qubty.
Meenakshi A. Hirani, of Meenakshi A. Hirani, P.A., Winter Park, for Appellees.
GRIFFIN, J.
This is an appeal of an order denying a motion to dismiss and/or to stay and compel arbitration. Because the brokerage contracts between the parties required arbitration, we reverse.
This case arises out of a number of virtually identical New England Life Insurance Company ["New England Life"] brokerage contracts signed by appellees, Rasiklal Nagda and Harshada Nagda ["Nagdas"], the plaintiffs below. Their complaint alleges that in late 1999, the Nagdas met with Sami Qubty ["Qubty"] and Dipak Shah ["Shah"], representatives of the Orlando office of New England Life. Qubty and Shah told the Nagdas that, if they transferred money to New England Life, they would be charged fees of 1% per annum on a portfolio of up to $500,000;.5% per year on a portfolio of $500,000 to $1 million; and a quarter percent per year on a portfolio of over a million dollars. They were further promised they could buy and sell an unlimited number of stocks with no extra trading fees and that all family accounts would be considered one account for the purpose of calculating fees. Based on these representations, the Nagdas transferred $488,000 to New England Life to be held in accounts listed in the names of the Nagdas and their three children, and they began to trade the stock in those accounts. The Nagdas were told by Qubty that New England Life did not intend to honor its earlier agreement due to excessive trading in the account, and were charged $32,000 in commissions on trades in violation of the brokerage agreement prior to the closing of the account.
The Nagdas filed a two-count complaint seeking damages for breach of contract and fraud in the inducement from New England Life, Qubty and Shah. New England Life filed a motion to dismiss on two grounds. Relevant to this appeal, New England Life asserted that documents signed by the Nagdas concerning their accounts contained mandatory arbitration clauses. Attached to the motion was a "New England Securities Account Application," which had been signed by Dr. Nagda on November 22, 1999. At the top of the signature page, the agreement stated in capital letters:
I ACKNOWLEDGE THAT I HAVE READ, UNDERSTAND AND AGREE TO THE TERMS SET FORTH IN THE CUSTOMER AGREEMENT AND REQUEST THAT YOU ACCEPT ONE OR MORE ACCOUNTS IN MY NAME.
Immediately above his signature, the agreement stated in bold type:
I represent that I have read the terms and conditions concerning this account and agree to be bound by such terms and conditions as currently in effect and as may be amended from time to time. This account is governed by a pre-dispute arbitration clause which is found on page 11 of the Customer Agreement. I acknowledge receipt of the pre-dispute arbitration clause.

The form "customer agreement" appended to the application stated in relevant part that:

I agree that all controversies that may arise between us concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened, shall be determined by arbitration by a panel of independent *955 arbitrators set up by either the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. as I may designate. I may also designate the American Arbitration Association or any other industry forum only to the extent expressly provided as an alternative under the securities laws of my state of residence. ...
Also appended was a "Premier Select SEP-IRA Application" signed by Dr. Nagda on November 11, 2000, which stated immediately above his signature:
I REPRESENT THAT I HAVE READ THE CUSTOMER AGREEMENT GOVERNING THIS ACCOUNT AND AGREE TO BE BOUND BY SUCH CUSTOMER AGREEMENT CURRENTLY IN EFFECT AND AS MAY BE AMENDED FROM TIME TO TIME. THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE WHICH IS FOUND ON PAGE 11. I ACKNOWLEDGE RECEIPT OF THE PRE-DISPUTE ARBITRATION AGREEMENT.

Virtually identical documents, containing the same arbitration provisions, had been signed by Mrs. Nagda. Dr. Nagda had also signed "New England Securities Account Applications" on behalf of the children. These documents had been countersigned by Shah and/or Qubty on behalf of New England Life.
The Nagdas filed a response asserting that the arbitration clause was unenforceable because:
the arbitration clause is an adhesion contract, the contract was based on fraud, and also the plaintiffs were not afforded the opportunity to read the contract or given the copies of the Account Applications, and therefore it is unenforceable.
Qubty filed his own motion to compel arbitration and stay the Nagdas' action. The Nagdas' response to Qubty's motion asserted that the arbitration agreements were unenforceable on similar grounds. In a supplemental response to Qubty's motion, the Nagdas also argued that they could not be compelled to arbitrate their claims against Qubty because he was not a signatory to the new account application and the Nagdas had sued Qubty in his individual capacity.
On or about August 31, 2001, the Nagdas filed a memorandum in opposition to defendants' motion to dismiss and/or to compel arbitration, in which they argued that the arbitration provisions were unenforceable for yet another reasonthat the contract had been rescinded by mutual cancellation. They explained that:
Plaintiffs were told that due to their excessive trading, they would not be allowed to trade in their accounts as per their previous agreement (paragraph 24). Based on this representation, Plaintiffs closed their accounts after the accounts were depleted by Defendants (paragraph 25) by charging commissions beyond their agreed condition to open the accounts. Thus, the contract was rescinded by mutual cancellation.
The Nagdas maintained that claims of fraud in the inducement of a contract were not subject to arbitration where the party claiming fraudulent inducement is seeking rescission of the contract. The court held a hearing on the party's motions and ultimately issued two nonspeaking orders denying the respective motions of New England Life and Qubty.
This case is governed by the Federal Arbitration Act, which by its terms applies to an arbitration clause in a contract involving interstate commence. See 9 U.S.C.A. s. 1, et seq.; Powertel, Inc. v. Bexley, 743 So.2d 570, 573 (Fla. 1st DCA 1999), review denied, 763 So.2d 1044 (Fla. 2000). With respect to these contracts, *956 federal law supersedes the Florida Arbitration Code, and the Florida Arbitration Code is applied in such cases only to the extent it is not inconsistent with federal law. See Cassedy v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 751 So.2d 143, 146-147 (Fla. 1st DCA 2000); Lee v. Smith Barney, Harris Upham & Co., 626 So.2d 969 (Fla. 2d DCA 1993); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Melamed, 405 So.2d 790, 792 (Fla. 4th DCA 1981), approved, 476 So.2d 140 (Fla. 1985). Brokerage contracts concerning the sale of securities have been consistently treated as contracts involving interstate commerce. See, e.g., Cassedy, supra; Lee, supra; Melamed, supra. See also Employers Ins. v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir.2001); Florida Power Corp. v. City of Casselberry, 793 So.2d 1174, 1179 (Fla. 5th DCA 2001).
Under both federal statutory provisions and Florida's Arbitration Code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived. Florida Power Corp. v. City of Casselberry, 793 So.2d at 1178-1179. All doubts regarding the scope of an arbitration agreement, as well as any questions about waiver, should be construed in favor of arbitration rather than against it. See Rath v. Network Mktg., L.C., 790 So.2d 461, 463 (Fla. 4th DCA 2001); Breckenridge v. Farber, 640 So.2d 208, 210 (Fla. 4th DCA 1994). This court reviews de novo a trial court's ruling on a motion to compel arbitration. Avid Engineering, Inc. v. Orlando Marketplace Ltd., 809 So.2d 1 (Fla. 5th DCA 2001).
The Nagdas contend that the trial court properly found that the agreement to arbitrate was unenforceable because the underlying contract was rescinded or terminated prior to the time that defendants moved to compel arbitration.[1] However, it is clear that the duty to arbitrate does not necessarily end when a contract is terminated, as long as the dispute concerns matters arising under the contract. See Litton Fin. Printing Div. v. N.L.R.B., 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); Nolde Bros. v. Local 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977); Aspero v. Shearson American Exp., Inc., 768 F.2d 106 (6th Cir.1985); Milbar Medical Co. v. Medicis Pharm. Corp., 741 So.2d 1198 (Fla. 4th DCA 1999). Cases such as Nolde and Litton indicate that arbitration agreements are to be construed to require arbitration of disputes arising even subsequent to cancellation of the underlying contract unless such grievances are specifically excluded from arbitration. Here, not only does the arbitration clause contain no exclusion for disputes arising subsequent to termination, but the dispute arose during the term of the agreement.
Nor does the fact that the Nagdas are seeking rescission of the contract on the basis of fraud in the inducement preclude enforcement of the arbitration provisions contained in the contract, as long as the claims for rescission are directed at the contract as a whole, as opposed to the arbitration provision contained in the contract. This is true with respect to arbitration sought under both the Florida and Federal Arbitration Acts. See, e.g., Prima *957 Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Great Western Fin. Secs. Corp. v. Grandison, 701 So.2d 1202 (Fla. 5th DCA 1997); Ronbeck Const. v. Savanna Club Corp., 592 So.2d 344 (Fla. 4th DCA 1992); Manning v. Interfuture Trading, Inc., 578 So.2d 842 (Fla. 4th DCA 1991).[2]
The Nagdas' contention that the order denying defendants' request for arbitration should be affirmed as to Qubty because he was sued in his individual capacity is based mainly on Hirshenson v. Spaccio, 800 So.2d 670 (Fla. 5th DCA 2001). Hirshenson involved a claim by an investor against Spaccio, an investment counselor, and Anchor, an "introducing broker." Spaccio and Anchor subsequently filed a motion to compel arbitration. The court agreed that both Spaccio and Anchor were covered by the arbitration provisions in an agreement made by the investor with a "clearing broker," given that the agreement expressly identified him as a third-party beneficiary. However, this court cautioned that:
The right of an intended, third party beneficiary to sue under a contract is recognized only if the parties clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party. Jim Macon Bldg. Contractors, Inc. v. Lake County, 763 So.2d 1223 (Fla. 5th DCA 2000).
Id.
Qubty concedes that the contract involved here does not designate him to be a third party beneficiary of the contract. He nonetheless contends he has a right to enforce the arbitration agreement under principles of agency. We agree.[3]
A number of courts have held that agents must be afforded the benefits of arbitration agreements made by their principal, at least to the extent that the principal's liability and the agent's liability are based on the same set of facts.[4]Merrill *958 Lynch, Pierce, Fenner & Smith, Inc. v. Melamed, 453 So.2d 858 (Fla. 4th DCA 1984) is typical of these cases, which appear to reason that broad arbitration provisions were intended to obligate signatories to the agreement to arbitrate disputes brought not only against the principal, but claims made against the principal's agents.[5]
Similarly, in Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110 (3d Cir.1993), the court held that by agreeing in the context of a customer's agreement to arbitrate "all controversies which may arise between us," the clients had committed themselves to arbitrate claims against the firm and its agents arising out of the brokerage relationship. The court noted that since the brokerage could act only through agents and employees, "an arbitration agreement would be of little value if it did not extend to [them]." Id. at 1122 (quoting Trott v. Paciolla, 748 F.Supp. 305, 309 (E.D.Pa.1990)). Accordingly, "[i]n keeping with the federal policy favoring arbitration," the court said it would "extend the scope of the arbitration clauses to agents of the party who signed the agreements." Id. at 1122. See also MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999) (a non-signatory may invoke agreement to arbitrate when, "under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."); Arnold v. Arnold Corp., 668 F.Supp. 625, 629 (N.D.Ohio 1987).
The Nagdas' final argument is that New England Life and/or Qubty have waived the right to arbitrate and therefore the order denying arbitration of their claims should be affirmed. The alleged basis of the waiver is three-fold: first, that the Nagdas were "never given copies of the opening account applications containing the arbitration clause"; second, that New England Life failed to warn the Nagdas during the fifteen month period of their negotiations that they should not waste their time filing a civil action, as there was an arbitration clause; and third, the defendants failed to demand arbitration while the parties were negotiating.
The Nagdas cannot be heard to complain that they did not know what was in the agreement, because as the Supreme Court of Florida explained in Allied Van Lines, Inc. v. Bratton, 351 So.2d 344 (Fla. 1977):
It has long been held in Florida that one is bound by his contract. Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding. No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it.
Id. at 347-348. Accord Sabin v. Lowe's, Inc., 404 So.2d 772 (Fla. 5th DCA 1981) ("A party has a duty to learn and know the contents of a proposed contract before he signs and delivers it and is presumed to know and understand its contents, terms and conditions."). Here, there is no allegation that the Nagdas were prevented *959 from reading the contract or were induced to refrain from reading the contract or that a copy was refused them.
The Nagdas' final waiver arguments are also unpersuasive. Defendants' presuit negotiation with the Nagdas is not inconsistent with the right to arbitrate. Nor were defendants under a duty to make a presuit demand for arbitration. Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217 (11th Cir.2000). We reverse and remand with instructions to order arbitration.
REVERSED and REMANDED.
COBB and HARRIS, JJ., concur.
NOTES
[1] The Nagdas rely mainly on Florida Title Loans, Inc. v. Christie, 770 So.2d 750 (Fla. 1st DCA 2000). The basis of Florida Title is unclear, but appears to have been decided on the basis that the subject matter of the litigation did not arise under the first of two loan agreements.
[2] In cases in which rescission has been found to preclude arbitration, rescission was not sought as a remedy in the action, but occurred prior to suit. See, e.g., Henderson v. Coral Springs Nissan, Inc., 757 So.2d 577 (Fla. 4th DCA 2000).
[3] Qubty does not appear to be entitled, however, to enforce the arbitration provision against the Nagdas under principles of equitable estoppel. See In re Humana, Inc. Managed Care Litigation, 285 F.3d 971 (11th Cir. 2002).
[4] See, e.g., Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110 (3d Cir. 1993) (holding that client could be compelled to arbitrate ERISA claims made against stockbroker and sister corporation, which were based on investment decisions made by brokerage firm, which had arbitration agreement with client); Letizia v. Prudential Bache Secs., Inc., 802 F.2d 1185 (9th Cir.1986) (holding that two stockbrokers who handled account were entitled to arbitration of claims brought against them by client of firm in suit for fraud and violation of federal securities laws; the court stated, "Other circuits have held consistently that nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."); Arnold v. Arnold Corp. Printed Communications for Business, 920 F.2d 1269, 1281 (6th Cir.1990)(members of board of directors were entitled to arbitration of fraud claims brought against corporation and individual board members); Breckenridge, 640 So.2d 208 (recognizing that stockbroker had right to enforce arbitration provision in agreement with brokerage firm, on basis that stockbroker was either third party beneficiary or because of his then-existing employee-employer relationship with Thomson McKinnon); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Melamed, 453 So.2d 858 (Fla. 4th DCA 1984) (claim against account executive employed by securities firm was subject to arbitration, pursuant to arbitration clause in contract governing cash management account between securities firm and customer, since language of the contract was broad enough to include persons within the respondeat superior doctrine); cf. Bel-Ray Co. v. Chemrite, Ltd., 181 F.3d 435 (3d Cir.1999)(directors and officers of distributor could not be compelled to arbitrate claims brought against them individually).
[5] The contract involved in this casewhich compels arbitration of "all controversies that may arise between us concerning any order or transaction"appears broad enough to include the broker.