

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-2001

# EI DuPont de Nemours v. Rhone Poulenc Fiber

Precedential or Non-Precedential:

Docket 00-3550

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"EI DuPont de Nemours v. Rhone Poulenc Fiber" (2001). *2001 Decisions*. Paper 241.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/241

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 15, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3550

E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware
corporation

v.

RHONE POULENC FIBER AND RESIN INTERMEDIATES,
S.A.S., aka Rhone-Poulenc Fibres et Polymeres S.A.;
RHODIA, a French corporation; RHODIA FIBER AND
RESIN INTERMEDIATES, S.A.S., formerly named Rhone
Poulenc Fiber and Resin Intermediates, S.A.S.; RHODIA,
SA, f/k/a Rhone Poulenc Fibres Et Polymeres S.A.

Rhodia Fiber and Resin Intermediates, SAS and
Rhodia SA,
        Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
D.C. Civil No. 99-cv-00874
District Judge: The Honorable Roderick R. McKelvie

Argued: September 5, 2001

Before: SCIRICA, ALITO, and BARRY, Circuit Jud ges

(Opinion Filed: October 15, 2001)

John A. Parkins, Jr., Esq. (Argued)
Robert W. Whetzel, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Attorneys for Appellants

P. Clarkson Collins, Jr., Esq.
  (Argued)
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

Attorneys for Appellee

OPINION OF THE COURT

BARRY, Circuit Judge:

In 1996, after years of negotiation, a Joint Venture Agreement ("the Agreement") was entered into between DuPont China ("DPC"), Rhone Poulenc Fiber and Resin Intermediates ("Rhodia Fiber"), and Liaoyang Petro-Chemical Fiber Company ("LYPFC"), a Chinese entity. DPC and Rhodia Fiber are subsidiaries of E.I. DuPont de Nemours and Company ("DuPont") and Rhodia, SA ("Rhodia"),[1] respectively. The object of the 50-year joint venture was to create Sanlong Nylon Company Limited ("Sanlong") to research, manufacture, and sell certain fibers. The joint venture ultimately failed and DuPont, the parent of DPC, brought suit against Rhodia Fiber and its parent, Rhodia, to recover, DuPont says, not for breach of the Agreement, to which it was not a party, but rather for breach of an oral agreement and fraudulent misrepresentations which occurred much later in time and as a result of which it was damaged. Rhodia Fiber and Rhodia moved to dismiss the complaint on various grounds and to compel arbitration. The District Court denied that

_____

1. Formerly known as Rhone Poulenc, Fibres Et Polymeres S.A.

2

motion in all respects, and an appeal was taken from the denial of the motion to compel arbitration and the denial of the motion to dismiss for lack of personal jurisdiction. We will affirm as to the former and dismiss the appeal as to the latter.

I. The Joint Venture Agreement

While DuPont does not purport to have sued on the Agreement itself, there is no dispute that the Agreement was at the heart of the proceedings before the District Court and is at the heart of this appeal. We begin, therefore, with the relevant provisions of the Agreement and the background of how this litigation came to be.

Each party to the Agreement -- DPC, Rhodia Fiber and LYPFC -- was to contribute significant capital to the joint venture in relation to its interest in the venture. In P 7.02, the parties agreed that:

> (a) The Company [Sanlong] will be responsible for obtaining financing that is beyond or in addition to the Company's registered capital by borrowing funds from sources inside China or outside China. Upon the unanimous affirmative vote of every director of the Board, each Party shall provide guaranties[sic] for such additional financing, in proportion to the Party's contribution to registered capital. A Party may guarantee the Company's local currency or foreign currency borrowings, provided that the aggregate amount of all guaranties [sic] provided, by each Party is in proportion to that Party's contribution to registered capital. If any Party's guaranty is not acceptable to the Lender, that Party shall, subject to any necessary approval of the relevant authorities, arrange a guaranty from a financial institution or other company acceptable to the lender.

> (B) Upon the unanimous affirmative vote of every director of the Board in support of the Company obtaining additional financing by way of borrowing from the Parties, each Party shall directly or indirectly provide loans for additional financing, in proportion to the Party's contribution to registered capital. The terms

3

and duration of such loans shall be equitable among the Parties and agreed upon by the Board.

P 7.02 (emphasis added). Nothing in this paragraph obligated either parent company –– DuPont or Rhodia –– to provide any guarantees or loans; rather, guarantees and/or loans were obligations of the subsidiaries.

Even though the parent companies were not parties to the Agreement, it was stated in the Agreement that they would "assist the Company in the balancing of foreign exchange during the Company's initial years of operation by exporting 14,000 tons and 6,000 tons per year of nylon 6,6 polymer flake respectively in accordance to the DuPont Polymer Flake Export Sales Agreement and RP Polymer Flake Export Sales Agreement respectively." P 10.01(b). Also, to ensure the success of the Company, the Agreement provided that the parties "and their Affiliates will not take action detrimental to the interest or well-being of the Company." P 10.03(a).2 In conjunction with the Agreement, DuPont (the parent) entered into three related agreements with the joint venture company: a supply agreement, a license contract and an export sales agreement. Rhodia (the parent) also entered into a similar series of related agreements.

_____

2. The Agreement defined "Affiliate," "Affiliates" or "Affiliated Company" as

> "any corporation, partnership, association, or other entity or
> organization which controls, or is controlled by, or is under
common
> control with, that Party. The term "control" as used with respect
to
> any Party, means the ownership, directly or indirectly of 50% or
> more of the voting stock of such corporation or the possession,
> directly or indirectly, of the power to direct or cause the
direction of
> the management and policies of such corporation, partnership,
> association or other entity or organization, or to receive,
directly or
> indirectly, 50% or more of the profits of such corporation,
> partnership, association or other entity or organization (whether
> through the ownership or voting stock, by contracts or otherwise).
> Notwithstanding the foregoing for purposes of this Contract,
> "Affiliate" "Affiliates" or Affiliated Company" shall not mean
China
> Petrochemical Corporation."

P 1.04.

Two provisions of the Agreement are of particular relevance and, thus, particular importance here. First, the Agreement contained an arbitration clause:

> In the event any dispute or claim or difference of any kind whatsoever arises in connection with the interpretation or implementation of this Contract (a "dispute"), including any question regarding its existence[,] validity or termination, the parties shall attempt in the first instance to resolve the dispute through friendly consultations. If the dispute is not resolved in this manner within sixty (60) days after one Party has given both the other Parties written notice of the existence of the dispute, then, the dispute shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SAIC") for the time being in force. The tribunal shall consist of three (3) arbitrators. The governing law of this arbitration shall be the substantive law of the PRC and the language of arbitration shall be English.

P 25.01 (emphasis added). Second, the Agreement provided that it was

> . . . made for the benefit of LYPFC, [Rhodia Fiber], DCH and their respective lawful successors and assignees and is legally binding on them. This Contract may not be changed orally, but only by a written instrument signed by LYPFC, [Rhodia Fiber] and DCH and approved by the Examination and Approval Authority.

P 27.03.

After the joint venture failed, DuPont filed a three count Complaint against Rhodia Fiber and Rhodia. In the first count, entitled "Third Party Beneficiary Claims," DuPont alleged that "DuPont, as the ultimate parent of DCH and as the party required to provide loan guaranties [sic] on behalf of its subsidiary DCH, was an intended party beneficiary of the Joint Venture Contract," and that "Rhodia Fiber materially breached the Joint Venture Contract by, without limitation, failing to provide or secure the required loan guaranties [sic]." A80–81. In the second count, entitled "Breach of Agreement to Secure and Provide

5

Guaranties/Promissory Estoppel," DuPont alleged that it was harmed by the breach by Rhodia Fiber and Rhodia of a January 1998 oral agreement between DuPont and the two defendants pursuant to which the defendants agreed to support the joint venture but did not thereafter provide or secure the requisite loan guarantees. In the third count, entitled "Fraudulent Inducement/Material Misrepresentation," DuPont alleged that Rhodia Fiber and Rhodia made false statements of fact to DuPont with the intent to induce DuPont's subsidiary DCH "to commit substantial resources and investments to the business of the Joint Venture and to induce DuPont to support the business of the Joint Venture by, inter alia, providing Loan guaranties on behalf of the Joint Venture." A83.

In response, the defendants moved to compel arbitration and to dismiss the action for lack of personal jurisdiction, insufficient service of process, failure to join an indispensable party, and forum non conveniens. DuPont then filed a First Amended Complaint significantly altering its theory of liability. For starters, DuPont dropped the first count of the Complaint, which alleged a breach of the Agreement to which it was an intended third party beneficiary. The first count of the Amended Complaint, entitled "Breach of Agreement to Secure and Provide Guaranties/Promissory Estoppel," instead mimicked the second count of the Complaint, i.e., alleging that at a meeting on January 22, 1998, Bruno deSoyres on behalf of Rhodia, the parent, and Rhodia Fiber, the subsidiary, entered into an oral agreement with DuPont to further support the joint venture by securing and providing loan guarantees, and abide by the obligations contemplated by the Agreement. According to the Amended Complaint,

> 22. During discussions regarding the EPC Contr acts, representatives of RP expressed concerns regarding the Joint Venture which led DuPont representatives to believe that the RP Group was reluctant to perform obligations arising from the Joint Venture Agreement. DCH, as the party to the Joint Venture Contract, and DuPont as the ultimate parent of DCH and the party providing the Loan guaranties required to finance the EPC Contracts, desired to confirm the commitment of

6

the Rhodia Group to the venture before executing of the EPC contracts and incurring the further financial liabilities associated therewith.

23. At the request of the Rhodia Group's deSoy res, representatives of DCH and DuPont convened a meeting with deSoyres in Wilmington, Delaware, on January 22, 1998. Kenneth Wall represented DuPont and Michael Estep represented DCH at this meeting. deSoyres represented the interests of the Rhodia Group.

24. During the meeting, DuPont and DCH receive d assurance that the Rhodia Group would continue to support the Joint Venture and fully perform all the obligations contemplated by the Joint Venture Contract as long as DuPont and DCH did. DCH and DuPont accepted and relied upon these assurances in proceeding with the Joint Venture, approving execution of the EPC Contracts and in agreeing to and ultimately providing Loan guaranties pursuant to the Joint Venture Contract.

A455-46.

DuPont alleged that the "Rhodia Group" breached this oral agreement, and, thus, DuPont named both the parent and the subsidiary in this count as well as the two remaining counts. The second count of the Amended Complaint mimicked the third count of the Complaint, i.e., alleging that at the January 1998 meeting the "Rhodia Group" made false statements regarding its intent to support the joint venture and induced DuPont by material misrepresentations to further support the joint venture. Finally, the third count of the Amended Complaint alleged "Negligent Misrepresentation" based upon the same statements underlying the new second count.

As noted above, the District Court denied defendants' motion to dismiss the complaint and to compel arbitration, and they appealed. We turn to the issues we are called upon to decide.

7

A. Should Arbitration Have Been Compelled as to a
      Non-Signatory?

The thrust of this appeal is whether the District Court erred in its refusal to compel arbitration.3 There is no dispute that the Agreement contained a valid and enforceable arbitration clause which required all disputes arising out of the Agreement between the parties be submitted to binding arbitration in Singapore. The only question is whether DuPont, a non-signatory to that Agreement, is bound by that arbitration clause. Similarly, there is no dispute that a non-signatory cannot be bound to arbitrate unless it is bound "under traditional principles of contract and agency law" to be akin to a signatory of the underlying agreement. Bel-Ray Co., Inc. v. Chemsite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999). Appellants appeal from the District Court's conclusion that DuPont was not bound to arbitrate because it was not (a) an intended third party beneficiary of the Agreement, (b) the disclosed principal of its agent, DPC, a party to the Agreement, or (c) equitably estopped from avoiding arbitration. We review the District Court's conclusions de novo. Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993).

As we recently held:

> The FAA establishes a strong federal policy in favor of compelling arbitration over litigation. The Act provides that if a party petitions to enforce an arbitration agreement, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. S 4. The presumption in favor of arbitration carries "special force" when international commerce is involved, because the United States is also a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral

---

3. This Court has jurisdiction to consider the appeal from the denial of a motion to compel arbitration. Sandvik AB v. Advent Int'l. Corp., 220 F.3d 99, 102-04 (3d Cir. 2000).

Awards. The CREFAA commits the courts of signatory states to refer parties to arbitration when the parties have agreed to arbitrate disputes. CREFAA is enforced in the United States under Chapter Two of the FAA.

Sandvik AB v. Advent International Corp., 220 F.3d 99, 104–05 (3d Cir. 2000) (internal citations omitted). The liberal policy "favoring arbitration agreements . . . is at bottom a policy guaranteeing the enforcement of private contractual arrangements," id., and under the FAA,"a court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute. Bel–Ray Co., Inc. v. Chemrite (PTY) Ltd., 181 F.3d 435, 444 (3d Cir. 1999) ("Arbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so.").

Because arbitration is a creature of contract law, when asked to enforce an arbitration agreement against a non-signatory to an arbitration clause, we ask "whether he or she is bound by that agreement under traditional principles of contract and agency law." Id. at 444. Each of appellants' theories for binding DuPont to the arbitration clause, i.e., third party beneficiary, agency/principal, and equitable estoppel, is a recognized principle of contract or agency law applicable in the arbitration context. See Thompson–CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (listing ways in which non-signatories have been bound to arbitration clauses); see also Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1294–96 (3d Cir. 1996) (non-signatories could not enforce arbitration clause against signatory where no exception applied, but successor to signatory could compel arbitration); Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923 (3d Cir. 1985)(compelling signatory-employee to arbitrate claims against signatory-employer and non-objecting related non-signatory), overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110 (3d Cir. 1993). We consider them in turn.

### 1. Was DuPont a Third Party Beneficiary?

Appellants maintain that DuPont was an intended third party beneficiary of the Agreement and, thus, DuPont is

9

bound by the arbitration clause. The District Court held that DuPont was not a third party beneficiary and, even if it were, because the claims asserted by DuPont do not arise from any "third party beneficiary" status under the Agreement, DuPont was not bound to arbitrate its claims as a third party beneficiary. The District Court was correct.

In a series of cases, courts have allowed non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements. John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59–61 (2d Cir. 2001) (member of NASD which was bound by its membership to arbitrate disputes, was properly compelled to arbitrate by third party beneficiary of that agreement); Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 29–30 (2d Cir. 1996) (same with respect to NYSE rules). In the reverse situation, we have also bound a non-signatory third party beneficiary to a forum selection clause in the underlying contract. Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 202–04 (3d Cir. 1983), overruled on other grounds by Lauro Lines v. Chasses, 490 U.S. 495 (1989). Thus, whether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary.

Appellants rely heavily on Coastal Steel in attempting to show that DuPont was as an intended third party beneficiary. In that case, a New Jersey company, Coastal Steel, entered into a contract with Farmer Norton which contained an arbitration clause. To fulfill that contract, and at Coastal's suggestion, Farmer Norton contracted with Tilghman for the purchase of a blast unit. The contract between Farmer Norton and Tilghman contained a forum selection clause which named England as the forum. While in bankruptcy, Coastal filed suit against, inter alia, Farmer Norton (also bankrupt), Tilghman, and its American parent alleging breach arising out of the Farmer Norton-Tilghman contract. The Bankruptcy Court and District Court denied Tilghman's motion to dismiss in favor of the forum selection clause contained in the Farmer Norton-Tilghman contract. We reversed, and held that Coastal, a non-signatory to the Farmer Norton-Tilghman contract, was a third party

10

beneficiary of that contract and, thus, was bound by the forum selection clause contained therein. Coastal Steel, 709 F.2d at 202–04. We reasoned that carving out an exception to the enforcement of forum selection clauses against third party beneficiaries would be "inconsistent with the law of contracts, which has long recognized that third–party beneficiary status does not permit the avoidance of contractual provisions otherwise enforceable." Id. at 203. By doing business with Farmer Norton knowing that Farmer Norton would, in turn, contract with Tilghman in order to fulfill the underlying contract with Coastal, Coastal was an intended third party beneficiary of the Farmer Norton–Tilghman contract and could not avoid the forum selection clause when it sued for breach of that contract. Id.

Appellants argue that DuPont, "whose employees negotiated this contract, has admitted that it was obligated to make a loan guarantee on behalf of DuPont China and that it was the intended beneficiary of the contract which allegedly required Rhodia Fiber to provide a similar guarantee." Appellants' Br. at 40. This argument is flawed for at least two reasons. First, unlike the clear third party beneficiary relationship in Coastal, there is no evidence that DuPont was an intended third party beneficiary under the Agreement. Under Delaware law, which is the law the parties discuss, to qualify as a third party beneficiary of a contract, (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre–existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract. Guardian Constr. Co. v. Tetra Tech Richardson, Inc. , 583 A.2d 1378, 1386 (1990) ("In order for third–party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third–party, whether it be creditor or donee, should be a material part of the contract's purpose."). Thus, if it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the

11

promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract. Appellants have not offered any evidence that DuPont was anything more than an incidental third party beneficiary.

The parties to the Agreement were only LYPFC (the Chinese entity), Rhodia Fiber and DCH; moreover, the Agreement provided that it was

> made for the benefit of LYPFC, [Rhodia Fiber], DCH and their respective lawful successors and assignees and is legally binding on them. This Contract may not be changed orally, but only by a written instrument signed by LYPFC, [Rhodia Fiber] and DCH and approved by the Examination and Approval Authority.

A158, P 27.03. The arbitration clause itself anticipated only three beneficiaries to the Agreement, all of them parties. It stated that if disputes could not be resolved amicably and "one Party has given both of the other Parties written notice of the existence of the dispute, then, the dispute shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SAIC") for the time being in force." P 25.01 (emphasis added). Although DuPont as the parent of DPC would certainly benefit from the success of DPC, DuPont was not an intended third party beneficiary of the Agreement any more than any parent who expects to benefit from the success of the business ventures of its subsidiary.

Appellants argue, however, that DuPont was a third party beneficiary because (a) DuPont negotiated the Agreement, (b) DuPont's claims "mirror DuPont China's claims in arbitration, all of which stem from the Joint Venture Contract," (c) DuPont was positioned to derive more than shareholder benefits from the joint venture, and (d) DuPont claimed in the initial Complaint that it was a third party beneficiary of the Agreement and that it was required to guarantee the joint venture company's debt under the Agreement. We disagree.

First, that DuPont negotiated the Agreement, without more, has nothing to do with whether it was a third party beneficiary. Second, appellants err in their contention that

12

DuPont's claims mirror DPC's claims in arbitration. DPC is arbitrating the breach of the underlying Agreement and seeking its lost profits and the recoupment of its investment whereas DuPont is litigating its losses arising out of a 1998 oral agreement that was breached and misrepresentations made by appellants' representative outside of the Agreement.4 Third, appellants have offered nothing to support their bald assertion that DuPont was positioned to derive more than shareholder benefits from the joint venture. While DuPont's "related agreements" at least potentially would have benefitted DuPont, they do not render DuPont an intended third party beneficiary of the Agreement. Fourth, although it was imprudent of DuPont to have alleged in its initial Complaint that it was a third party beneficiary of the Agreement, the question of its status is ultimately for us to decide under applicable law. Parenthetically, we note that it was also imprudent for DuPont to allege, as it initially alleged, that it was required under the Agreement to guarantee the joint venture's debt. DuPont now states, correctly, that under the Agreement, DPC was required to provide a suitable guarantee and that, DuPont, in turn, chose to provide that guarantee for DPC.

Appellants' third party beneficiary argument fails for yet another, perhaps more obvious, reason. Appellants point out that "[t]he Court in Coastal Steel applied the forum selection clause to all claims that implicated the underlying contract to which Coastal Steel was third-party beneficiary, including claims for negligent design, breach of implied warranty and misrepresentation." Appellants' Br. at 37. Coastal Steel, its progeny and Delaware law make clear that a third party beneficiary will only be bound by the terms of the underlying contract where the claims asserted by that beneficiary arise from its third party beneficiary status. Industrial Electronics Corp. v. iPower Distribution Group, Inc., 215 F.3d 677, 680 (7th Cir. 2000) (third party beneficiary non-signatory was not compelled to arbitrate

_____

4. DPC alleged in the arbitration that Rhodia Fiber failed to provide the required guarantee under Article 7.02 for a proposed loan to Sanlong, causing the loan not to be made and, thus, causing Sanlong's collapse and dissolution. At oral argument, we were advised that Rhodia Fiber lost the arbitration but that damages had not yet been set.

13

claims because the claims did not arise out of the contract from which it derived its third party status); Spear, 85 F.3d at 29-30. None of DuPont's amended claims, however, arise out of its alleged third party beneficiary status under the Agreement; rather, DuPont's claims arise from the misrepresentations allegedly made to it by appellants' representative. Those misrepresentations, while arguably related to the underlying Agreement, do not relate to any "third party beneficiary" status created at the inception of the Agreement.5

### 2. Agency

Next, appellants argue that DuPont's intimate involvement with the Sanlong project renders it liable under traditional agency principles because DPC acted as DuPont's disclosed agent and, under principles of agency law, DuPont is bound by DPC's Agreement. The District Court correctly rejected this argument, a conclusion underscored by the fact that appellants have failed to cite either the relevant factors we should consider in determining whether DCH acted as DuPont's agent or any case that would carry the day.

Traditional principles of agency law may bind a non-signatory to an arbitration agreement. Thomson-CSF, S.A. v. American Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995). Under Delaware law:

_____

5. Even if this Court were to find that DuPont is bound by the Agreement and, thus, by the arbitration clause, DuPont might well argue that its claims fall outside the scope of that clause. The arbitration clause applies only to a dispute that "arises in connection with the interpretation or implementation of this Contract." A156, P 25.01. Even though the "arising out of " language has been read broadly by courts, DuPont could argue that its claims in the Amended Complaint arise out of alleged obligations or misrepresentations made outside of the Agreement and not arising therefrom. See Industrial Electronics, 215 F.3d at 680 (third party beneficiary non-signatory was not compelled to arbitrate claims because the claims did not arise out of the contract from which it derived its third party status.). Thus, it is not a foregone conclusion that, were this Court to find DuPont bound by the Agreement, this case would automatically be sent to arbitration.

14

> One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company. However, one corporation -- completely independent of a second corporation -- may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.

> When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent. Liability may attach to the principal corporation even though it is not a party named in the agreement.

> Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the proponent must demonstrate a relationship between the corporation and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff 's claim of wrongdoing.

Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988) (citations omitted). To bind a principal by its agent's acts, the plaintiff must demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship. Id.

Appellants rely principally on J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textiles, S.A., 863 F.2d 315 (4th Cir. 1988) and Phoenix Canada in support of their agency argument. In Phoenix Canada, we did not apply agency principles but, instead, remanded for the District Court to make this fact-intensive inquiry. Moreover, we noted that the agency relationship must relate to the cause of action alleged in the complaint. It is far from clear that this case passes that test. Appellants' reliance on J.J. Ryan & Sons is also misplaced. The Fourth Circuit never cited to agency

15

principles and merely permitted a signatory to arbitrate its claims against a non-signatory parent company where that parent company was willing to submit to arbitration. J.J. Ryan & Sons, 863 F.2d at 320-21. The Court noted, however, held that a court "may" refer claims against a non-signatory parent to arbitration when the claims against the parent and the subsidiary are "based on the same facts and are inherently inseparable." Id. at 320. No such claim can be made here.

Appellants also invoke Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110 (3d Cir. 1993), but Pritzker is inapposite. In Pritzker, we bound an agent to the principal's arbitration agreement. Here, appellants seek to hold a principal to an agent's agreement and the rationale of Pritzker does not apply with equal force. In Pritzker, a trustee of a pension plan sued its broker, Merrill Lynch, and a related company to recover for violations of ERISA. Merrill Lynch moved to compel arbitration and the District Court denied that motion. We reversed, holding that (a) the trustees were bound to arbitrate their claims against Merrill Lynch as signatories to a binding arbitration agreement, and (b) over the trustees' objection, the trustees were bound to arbitrate the dispute against the individual broker and the sister company, neither of which signed the aforementioned agreement. Specifically, with respect to the broker, we found that where the principal is bound to arbitration and the complaints arise out of the agent's conduct on behalf of that principal, the agent is bound by the principal's agreement to arbitrate disputes. Id. at 1122. With respect to the sister company, we summarily found that company bound as an agent and possibly as an alter-ego of Merrill Lynch. Id.

In the case sub judice, unlike Pritzker , appellants seek to hold DuPont liable as a principal, not as an agent; moreover, unlike Pritzker, DuPont could act on its own.

Appellants' attempt to bind DuPont on agency principles fails.

### 3. Equitable Estoppel

Finally, appellants argue that DuPont is equitably estopped from avoiding the arbitration clause in the

16

Agreement. We have never applied an equitable estoppel theory to bind a non-signatory to an arbitration clause although there appears to be no reason why, in an appropriate case, we would refrain from doing so.

As the Second Circuit recently explained, there are two theories of equitable estoppel in this context. First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. Thomson-CSF, S.A. v. American Arbitration Assoc., 64 F.3d 773, 778 (2d Cir. 1995). Second, courts have bound a signatory to arbitrate with a non-signatory "at the nonsignatory's insistence because of`the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and[the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.' " Id. at 779 (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)(quoting McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (7th Cir. 1984))(internal quotation marks omitted). Appellants' reliance on the first of these two theories stands on somewhat stronger ground than their reliance on the second.

Under the first theory, courts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful. See, e.g., American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (3d Cir. 1999) (non-signatory bound by contract under which it received the direct benefits of lower insurance and the ability to sail under the French flag); Thomson-CSF, S.A., 64 F.3d at 779 (finding only indirect benefit insufficient to invoke equitable estoppel against a non-signatory). As the Fourth Circuit explained, "In the arbitration context, the doctrine recognizes that a party may be estoped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to

17

benefit him. `To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.' " International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000) (internal citation omitted).

Generally, these cases involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract. See, e.g., Tencara Shipyard, 170 F.3d at 353 (non-signatory derived benefit from contract and could not avoid the arbitration clause contained therein).6 Here, there is no evidence that DuPont embraced the Agreement itself during the lifetime of the Agreement, or that it received any direct benefit under the Agreement. Thus, in a strict sense, these cases do not help appellants.7

What gives us some pause, however, is that a close examination of the Amended Complaint reveals that, at bottom, DuPont's claims against the subsidiary, Rhodia Fiber, arise, at least in part, from the underlying

_____

6. At least one court has referred to "equitable estoppel" when it required
a non-signatory to arbitrate based on its conduct during litigation as opposed to during the lifetime of the commercial contract. International Paper Co., 206 F.3d at 417–18 (buyer was bound to arbitrate claim against manufacturer even though it was not a signatory to manufacturer-distributor contract because the buyer alleged a breach of that contract). While at first blush this appears helpful to appellants, a closer examination reveals that the non-signatory in that case also received a direct benefit under the contract during the lifetime of the contract.

7. We cannot help but note that many of these cases resemble the third party beneficiary cases. In Tencara Shipyard, for example, the non-signatory was the intended third party beneficiary of the contract containing the arbitration clause. The two theories of liability are, however, distinct. Under the third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under equitable estoppel is much later in time than the snapshot for third party beneficiary analysis.

Agreement. Parenthetically, it is difficult to decipher exactly what DuPont claims each appellant has done giving rise to liability because in its Amended Complaint DuPont lumps them together as "the Rhodia Group," just as in the Complaint, it lumped them together as "RP."

The Amended Complaint does not allege only that Rhodia, the parent, breached its oral agreement to provide loan guarantees to its subsidiary. If this were DuPont's only claim in this case, the Amended Complaint would have named one, and only one, defendant -- Rhodia. Instead, the Amended Complaint also named Rhodia Fiber, the subsidiary, as a defendant because, DuPont alleges, Rhodia Fiber breached its oral promise to DuPont that it would continue to abide by its obligations in the Agreement, i.e., securing loan guarantees for the joint venture. To the extent that DuPont presses a claim against Rhodia Fiber for breaching its oral commitment to perform under the Agreement, DuPont alleges a claim which can well be argued (a) embraces the underlying Agreement and (b) requires proof that Rhodia Fiber ultimately breached the underlying Agreement. The question, then, is whether having alleged that it entered into a separate oral agreement with Rhodia Fiber binding Rhodia Fiber to the very obligations it undertook in the Agreement, DuPont is now equitably estopped from avoiding another provision of the Agreement, i.e., the arbitration clause. This is a close call.

On the one hand, we must be careful about disregarding the corporate form and treating a non-signatory like a signatory. On the other hand, by alleging, albeit by virtue of a separate oral agreement, that Rhodia Fiber failed to secure loan guarantees, DuPont's claim against Rhodia Fiber implicates, at least in part, the very Agreement which DuPont repudiates to avoid arbitration. It is, however, that separate oral agreement that saves the day for DuPont because, wholly apart from whether Rhodia Fiber breached the Agreement, what is at the core of this case is the conduct and the statements of appellants' representative in January of 1998.

With reference to the second theory of equitable estoppel, appellants rely on a series of cases in which signatories

19

were held to arbitrate related claims against parent companies who were not signatories to the arbitration clause. In each of these cases, a signatory was bound to arbitrate claims brought by a non-signatory because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations. Thomson-CSF, S.A., 64 F.3d at 779. In essence, a non-signatory voluntarily pierces its own veil to arbitrate claims against a signatory that are derivative of its corporate-subsidiary's claims against the same signatory. Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000) (non-signatory able to compel signatory to arbitrate claims related to the contract which contained an arbitration clause); J.J. Ryan & Sons, 863 F.2d at 320-21 (discussed above); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993) (compelling signatory to arbitrate claims against non-signatory that were intertwined with claims arising from contract governed by arbitration clause); Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp. , 659 F.2d 836, 840-41 (7th Cir. 1981) (same); McBro Planning and Dev. Co. v. Triangle Elec. Const. Co., Inc., 741 F.2d 342, 344 (11th Cir. 1984) (non-signatory to contract containing arbitration clause was bound by signatory to arbitrate dispute where claims were inextricably intertwined with duties created in underlying contract and non-signatory signed a related contract which contained an arbitration clause).[8] Appellants recognize that these cases bind a signatory not a non-signatory to arbitration, but argue that this is a distinction without a difference. They are wrong.

_____

8. See also Dominiun Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 728 (8th Cir. 2001) (party equitably estopped from arguing that opposing parties were not bound by arbitration clause where that same party alleged in other lawsuit that those opposing parties were bound by the contract containing the arbitration clause.); Long v. Silver, 248 F.3d 309, 320 (4th Cir. 2001) (compelling signatory to arbitration clause to arbitrate claims against non-signatory shareholders where the signatory claimed that the non-signatories owed him a duty under the contract they did not sign).

20

Indeed, the Second Circuit recently rejected the same "distinction without a difference" argument:

> As these cases indicate, the circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, "[t]he situation here is inverse: E & S, as signatory, seeks to compel Thomson, a non-signatory." While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S. Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed.

Thomson-CSF, S.A., 64 F.3d at 779 (internal citations omitted). The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged. The District Court recognized that this was so, holding that the corporate form cannot be discarded and a non-signatory required to arbitrate unless its conduct falls within one of the accepted principles of agency or contract law that permit doing so.

In sum, the thrust of the claims in the Amended Complaint are far enough removed from the Agreement such that DuPont should not be equitably estopped from

repudiating the arbitration clause contained in the Agreement.

II. Is the Issue of Personal Jurisdiction Now Appealable?

DuPont has moved to dismiss appellants' appeal from the District Court's concededly interlocutory order denying appellants' motion to dismiss for want of personal jurisdiction. Appellants ask this Court to exercise its discretion in favor of review under the doctrine of pendent appellate jurisdiction. We reject appellants' request.

The doctrine of pendent appellate jurisdiction, in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction. In re TuTu Wells Contamination Litigation, 120 F.3d 368, 382 (3d Cir. 1997)(citing 16 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and ProcedureS 3937 at 684-85 (2d ed. 1996). In Swint v. Chambers County Commission, the Supreme Court considered the availability of pendent appellate jurisdiction and explicitly struck down the Eleventh Circuit's liberal construction of 28 U.S.C. SS 1291 and 1292 which, the Court said, circumvented the limits Congress set on appellate jurisdiction of interlocutory orders -- in other words, those orders listed in 1292(a) and those certified by a district court under 1292(b). 514 U.S. 35, 45-47 (1995).

> Congress thus chose to confer on district courts first line discretion to allow interlocutory appeals. If courts of appeals had discretion to append to a Cohen – authorized appeal from a collateral order further rulings of a kind neither independently appealable nor certified by the district court, then the two-tiered arrangement S 1292(b) mandates would be severely undermined.

Id. at 47 (internal footnotes omitted). Despite this rather absolute language, the Court did not foreclose entirely the availability of pendent appellate jurisdiction:

22

We need not definitively or preemptively settle here whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable. The parties do not contend that the District Court's decision to deny the Chambers County Commission's summary judgment motion was inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions, or that review of the former decision was necessary to ensure meaningful review of the latter.

Id. at 50-51 (internal citations omitted).

Building on this guarded endorsement of pendent appellate jurisdiction in certain limited circumstances, we and other Circuits have recognized "a discretionary, though `narrow,' doctrine of pendent appellate jurisdiction. But we have also concluded that the doctrine should be used `sparingly,' and only where there is a sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant plenary review. We have also stated that `pendent appellate jurisdiction over an otherwise unappealable order is available only to the extent necessary to ensure meaningful review of an appealable order.' " In re Montgomery County, 215 F.3d 367, 375-76 (3d Cir. 2000) (emphasis in original) (citations omitted); see also In re Tutu Wells, 120 F.3d at 382. Essentially, post-Swint, we have defined pendent appellate jurisdiction to mirror the Supreme Court's two examples: inextricably intertwined orders or review of the non-appealable order where it is necessary to ensure meaningful review of the appealable order.

Although we have not addressed whether we should exercise pendent jurisdiction over an appeal of a motion to compel arbitration, other Circuits have done so. Where personal jurisdiction is inextricably intertwined with the immediately appealable decision on a motion to compel arbitration or other immediately appealable order, Courts of Appeals have exercised pendent jurisdiction over a personal jurisdiction issue, but those Courts have been careful to explain that the basis of the personal jurisdiction decision was identical to the basis of the immediately appealable

23

order. PaineWebber Inc. v. Chase Manhattan Private Bank, 260 F.3d 453, 461–62 (5th Cir. 2001) (consent to arbitrate claim in particular forum was also the basis of exercise of personal jurisdiction and, thus, the issues were interrelated and both reviewed on appeal); Dominium Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 726–27 (8th Cir. 2001) (implicitly the same); S & Davis Int'l, Inc. v. The Republic of Yemen, 218 F.3d 1292, 1297 (11th Cir. 2000) (exercising pendent jurisdiction over personal jurisdiction issue when immunity under Foreign Sovereign Immunity Act was properly before the court and the two issues were "inextricably intertwined"); Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127, 130 (2d Cir. 1998) (same).

Where, however, personal jurisdiction is not "interrelated" or "intertwined" with the merits of the immediately appealable order, Courts of Appeals exercise restraint and forego review until the unrelated issue is appealable in its own right. See, e.g., United States Fidelity and Guaranty Co. v. Braspetro Oil Services Co., 199 F.3d 94, 97 (2d Cir. 1999) (exercising pendent appellate jurisdiction over interrelated personal jurisdiction issue but refusing to review interlocutory forum issue because it has "little or nothing in common with" the appealable order); Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 759 (2d Cir. 1998); see also Associated Business Telephone Systems, Corp. v. Greater Capital Corp., 861 F.2d 793, 796 (3d Cir. 1988) (passing on personal jurisdiction of defendant company against whom injunction was granted to ensure that injunction was granted against party over whom the district court had authority, but refusing to review personal jurisdiction of individual defendants who were not affected by injunction). The fact that personal jurisdiction is or can be case-dispositive does not alter the analysis for two reasons. First, denials of motions to dismiss for want of personal jurisdiction are not ordinarily immediately appealable. Second, as the Second Circuit explained:

> It does not follow, however, that a court cannot decide issues of subject matter jurisdiction without at the same time making definitive findings as to personal jurisdiction. For instance, a court could find subject

24

matter jurisdiction without passing on whether there had been effective service of process, thus leaving the personal jurisdiction question open. The current case presents a different example of the same point. Libya's challenge to personal jurisdiction is based on due process and the principle of minimum contacts. We can readily decide whether the district court had subject matter jurisdiction over Libya without at all considering whether it would violate due process to subject Libya to personal jurisdiction. Because review of the latter is not necessary for review of the former, we conclude that the issues of subject matter jurisdiction and personal jurisdiction are not inextricably intertwined in this case.

Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 759 (2d Cir. 1998).

We undoubtedly have jurisdiction over the District Court's refusal to compel arbitration and, as the previous section of this opinion indicates, that issue can be discussed at length and resolved without any reference to whether there was personal jurisdiction over appellants or whether the meeting in Delaware attended by their representative amounted to "minimum contacts." Indeed, for purposes of reviewing and resolving the arbitration issue, we were bound to accept as true DuPont's allegation that a "Rhodia Group" representative made the representations alleged in the Amended Complaint without passing on their existence, accuracy or effect. Moreover, the "interrelatedness" listed by appellants is far wide of the mark -- they cite to the existence and location of DuPont's actions, which simply have nothing to do with whether the District Court properly exercised jurisdiction over them.9 The issue of personal jurisdiction does not have to be reviewed to exercise meaningful review of the immediately

_____

9. The cases cited by appellants do not further their argument. Three of those cases were before the respective Courts of Appeals after final judgment, and personal jurisdiction was considered first because it was a threshold issue. The remaining case -- which, in any event, predated Swint -- involved the grant of an injunction. It is well-settled that when a court grants an injunction, the underlying personal jurisdiction decision is immediately reviewable on appeal.

25

appealable arbitration issue, and we will not exercise pendent appellate jurisdiction to review that issue now.

III. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court insofar as it denied appellants' motion to compel arbitration and will dismiss the appeal from the denial of appellants' motion to dismiss for lack of personal jurisdiction.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit